AFSHIN SIMAN
LAW OFFICE OF AFSHIN SIMAN
6210 Wilshire Blvd., Suite 211
Los Angeles, CA 90048
(424) 229-9778
siman@simanlawfirm.com

Steven L. Woodrow*
swoodrow@woodrowpeluso.com
Patrick H. Peluso*
ppeluso@woodrowpeluso.com
Woodrow & Peluso, LLC
3900 East Mexico Avenue, Suite 300
Denver, Colorado 80210
Telephone: (720) 213-0676
Facsimile: (303) 927-0809

*Pro Hac Vice

Attorneys for Plaintiff and the Putative Class

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHAEL TRUJILLO,** individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **FREE ENERGY SAVINGS COMPANY, d/b/a QUALITY CONSERVATION SERVICES**, a Delaware limited liability company, <br><br> Defendant. | Case No. 5:19-cv-02072 <br><br> **PLAINTIFF'S RESPONSE IN OPPOSITION TO PARTIAL MOTION FOR SUMMARY JUDGMENT** <br><br> Date: December 7, 2020 <br> Time: 9:00 AM <br> Judge: Hon. Mark C. Scarsi <br> Place: Courtroom 7C <br><br> Complaint Filed: October 29, 2019 <br><br> Trial Date: August 24, 2021 |

## I.     INTRODUCTION

This case challenges Free Energy Savings Company, LLC d/b/a Quality Conservation Services's ("Defendant" or "QCS") violations of the Telephone Consumer Protection Act ("TCPA"), 47 USC § 227, *et seq*. To hear QCS tell it, however, Plaintiff can't proceed to trial on his Do Not Call Registry ("DNC") claim. That is, QCS asserts that the text messages it sent to Plaintiff were not "telephone solicitations" under the TCPA and, even if they were, it can invoke the established business relationship exemption. QCS thus claims that summary judgment must be awarded in its favor.

In reality—and notwithstanding QCS's strident efforts to skirt liability— QCS's text messages were sent for the purpose of soliciting Plaintiff for commercial products and services such as repairs and improvements to air conditioning units and windows, and the installation of LED lights and insulation. The fact that Plaintiff may not have been the party responsible for paying for the commercial products and services he was being solicited for if he qualified does not change the inquiry. QCS is not a charity. Although qualifying consumers may not have to pay for the products and services QCS solicits, QCS is compensated for the products and services it provides by a third party. A direct monetary transaction between a customer and QCS is not necessary for the text messages at issue to be considered "telephone solicitations". Simply put, the more qualifying consumers QCS solicits, the more money QCS collects from third parties. The messages thus are commercial in nature and constitute solicitations.

Additionally, Defendant asserts that it has a valid EBR defense. This argument also fails. There is no prior relationship between Plaintiff and Defendant, and the only basis for QCS's argument to the contrary seems to be that Plaintiff and his fiancée were subscribers to Southwest Gas ("SWG")—an entity with which

Richard Heath & Associates, Inc. ("RHA"), a company for which QCS provides subcontracting services to pursuant to an agreement between QCS and RHA, has a direct contract with—over a year prior to the text messages being sent. This does not constitute a "voluntary two-way communication" between Trujillo and QCS. Moreover, the regulations state that the "subscriber's established business relationship with a particular business entity does not extend to affiliated entities unless the subscriber would reasonably expect them to be included given the nature and type of goods or services offered by the affiliate and the identity of the affiliate." 47 C.F.R. § 64.1200. QCS is not SWG's affiliate, and its EBR defense falls apart.

Accordingly, and as explained below, the Court should deny QCS' Motion for Summary Judgment and allow the case to proceed to class certification and trial.

## II.   FACTUAL BACKGROUND

Plaintiff received two identical text messages that stated, "Dear Amanda Schwab: Your Home on Green Tree Blvd may be entitled to Free Weatherization funded by SWG/SCE, including A/C, coolers, LED lights, insulation, window/door repairs, 20% utility discounts. To schedule your free improvements, contact (909) 657-6981 or www.qcsca.com/enroll - Irene" on August 6, 2019 and August 12, 2019 (Dkt. 59, ¶ 1; Dkt. 1 ¶¶ 22-23.) Trujillo and his fiancée had previously been SWG customers, but that ended on February 22, 2018: 17 months and 15 days before QCS sent its first text message to Plaintiff. (Dkt. 59-2 ¶ 13.)[1]

---

[1] QCS accuses Plaintiff's counsel of "falsely represent[ing] that Plaintiff's gas company 'is not Southwest Gas'" in a January 7, 2020 email. (Dkt. 58, n. 4.) This is supposedly because Schwab "admit[ed] Plaintiff's gas company was SWG". (*Id.*) But there is nothing false about the statement. When Plaintiff's counsel stated on January 7, 2020 that Plaintiff's gas company "is not Southwest Gas," that was true. The SWG service ended in February 2018. Both things are true: Plaintiff's gas company was SWG in the past, but wasn't in January 2020.

1    QCS is a for-profit limited liability company that entered into a contract with

2    RHA effective June 1, 2019. (Dkt. 59-1, Ex. 1.) The contract stated in part:

3         RHA is the prime Subcontractor under a "Service Agreement",

4         numbered RC13822, with Southwest Gas Corporation ("Southwest

5         Gas" or "SWG") in support of the Small Multi-Jurisdictional Utilities

6         Energy Savings Assistance Program Contract, dated May 15, 2019

7         referred to herein as the "Prime Contract." RHA wishes to engage Free

8         Energy Savings Company, LLC dba Quality Conservation Services as a

9         Subcontractor in the performance of RHA's services under the Prime

10        Contract.

11   (Dkt. 59-1, Ex. 2.)

12        QCS was compensated for the work performed in accordance with its

13   contract with RHA and received payment from RHA, as follows:

14        3.1 For the performance of the Work, RHA agrees to pay Subcontractor

15        in accordance with (i) the Statement of Work and Subcontractor

16        Attachment 1, Measure Price List. . . . Continued authorization for

17        program activities is subject to the actions and decisions of the CPUC,

18        SWG, and RHA. The actual total expenditures under this Agreement

19        shall be based on the unit prices and the number of units completed.

20        RHA reserves the right to adjust unit allocations, costs, and unit prices

21        should overall program costs exceed amounts authorized by SWG.

22        3.2 As per the Statement of Work, Subcontractor shall data enter

23        information into RHA's SMJU database for completed work. RHA will

24        generate invoices for submission to SWG weekly for the work. RHA

25        will forward payment to Subcontractor within five (5) working days of

26        receipt of payment from SWG, which follows a monthly payment cycle.

27   _____

28

1  (Dkt. 59-1, Ex. 1, p. 3.)

2   Based on the record, and as demonstrated below, the Court should refuse to

3  grant summary judgment in QCS's favor.

4  **III.   LEGAL STANDARD**

5   Courts must act "with caution in granting summary judgment." *Anderson v.*

6  *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party must demonstrate

7  the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S.

8  317, 323 (1986). A fact is "material" if its proof or disproof is essential to an

9  element of a plaintiff's case, *Id.* at 322-323, and a dispute is genuine "if the

10 evidence is such that a reasonable jury could return a verdict for the nonmoving

11 party." *Anderson*, 477 U.S. at 248. All justifiable inferences must be viewed in a

12 light most favorable to the non-moving party. *Cnty. Of Tuolumne v. Sonora Cmty.*

13 *Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001). Any doubt as to the existence of a

14 genuine issue for trial is resolved against the moving party. *See Ponsetti v. GE*

15 *Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

16  Summary judgment must be denied if reasonable minds could differ on the

17 inferences to be drawn from undisputed facts. *See Lake Nacimiento Ranch Co. v.*

18 *San Luis Obispo Cnty.*, 841 F.2d 872, 875 (9th Cir. 1987); *Clemons v. Doughery*

19 *Cnty., Ga.*, 684 F.2d 1365, 1369 (11th Cir. 1982).

20 **IV.   ARGUMENT**
    **A.   The TCPA**

21

22  Finding that unsolicited telemarketing calls were the "scourge of modern

23 civilization," 137 Cong. Rec. 30821 (1991) (statement of Sen. Hollings), Congress

24 enacted the TCPA in an attempt to end "the proliferation of intrusive, nuisance

25 calls". 105 Stat. 2394 (Dec. 20, 1991). To that end, the TCPA and its implementing

26

27

28

regulations prohibit entities from making any "telephone solicitation" to telephone numbers that have been registered with the National Do Not Call Registry.

**B.     QCS's Texts Are Telephone Solicitations**

QCS is correct that the DNC regulations only apply to "telephone solicitations", that Congress was focused on calls which are "commercial in nature," and that the DNC regulations apply only to "commercial sales calls". (Dkt. 58 7-8.) But QCS is incorrect that its messages do not fall under this umbrella.

"To come within the definition [of a telephone solicitation], a caller must encourage a commercial transaction." H.R. REP. 102-317, 13. (noting that "public opinion polling, consumer or market surveys, or other survey research" would not fall within the definition).  "The definition limits its applicability to callers with an economic motive." *Hand v. Beach Entm't KC, LCC*, 425 F. Supp. 3d 1096, 1127 (W.D. Mo. 2019)

As the FCC has stated in the pre-recorded call context, "messages that promote goods or services at no cost are nevertheless unsolicited advertisements because they describe the quality of any property, goods, or services." In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 20 F.C.C. Rcd. 3788, 3804 (2005). As the FCC's 2005 Order further explained:

> As we stated in the *2003 TCPA Order*, the fact that a sale is not completed during the call or message does not mean the message does not constitute a telephone solicitation or unsolicited advertisement. Messages that describe a new product, a vacation destination, or a company that will be in "your area" to perform home repairs nevertheless are part of an effort to sell goods and services, even if a sale is not made during the call. In addition, as discussed above, messages that promote goods or services at no cost are nevertheless unsolicited

advertisements because they describe the "quality of any property, goods or services."

*Id.* This is similar to the FCC's 2006 conclusion in the "junk fax" context. *See* In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 Junk Fax Prevention Act of 2005, 21 F.C.C. Rcd. 3787, 3814 (2006) ("We conclude that facsimile messages that promote goods or services even at no cost, such as free magazine subscriptions, catalogs, or free consultations or seminars, are unsolicited advertisements").

The Fourth Circuit's Opinion in *Carlton & Harris Chiro., Inc. v. PDR Network, LLC*, 883 F.3d 459 (4th Cir. 2018) is instructive. There, the Fourth Circuit held that a fax offering the fax recipient a free copy of a book fell within the TCPA's reach. As the Fourth Circuit explained:

> The district court is correct that Congress enacted the TCPA to combat an "explosive growth in unsolicited facsimile advertising, or 'junk fax.'" *See* H.R. Rep. 102–317. But requiring a fax to propose a specific commercial transaction on its face takes too narrow a view of the concepts of commercial activity and promotion, and ignores the reality of many modern business models.
>
> This case illustrates why the FCC may have decided to implement so broad a rule. . . . We do know that PDR Network receives money from pharmaceutical companies whose drugs are listed in the *Physicians' Desk Reference*. And nothing in the record suggests that PDR Network is a charity that distributes free e-books without hope of financial gain. . . . **All told, we think it entirely plausible that PDR Network distributes the free e-books to further its own economic interests.**

*Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 883 F.3d 459, 467–68 (4th Cir.) (emphasis added). *See also Bais Yaakov of Spring Valley v. Alloy, Inc.*, 936 F. Supp. 2d 272, 283 (S.D.N.Y. 2013) (holding in the fax context that "the faxes seek subscribers to what is plainly a commercial product . . . and **the fact that the recipient of the fax is not the one paying for the product does not make the proposed transaction non-commercial**.") (emphasis added.)

Thus, the fact that Plaintiff himself may not have been responsible for paying for the commercial products and services he was being solicited for by QCS does not preclude Plaintiff's DNC claim. QCS sent the text messages at issue to "further its own economic interests". The more consumers it successfully solicited, the more money it would receive from RHA. As in *Alloy*, the fact that the consumer is not the one paying for the product or service does not make the solicited transaction non-commercial.  And as the *Hand* Court stated, the definition of "telephone solicitation" encompasses only callers with an "economic motive". QCS clearly had an economic motive here and was soliciting blatantly commercial products such as air conditioners, windows, and LED lights. This is enough for the text messages at issue to be actionable.

QCS relies heavily on *Williams v. Nat'l Healthcare Review*, 2017 WL 4819097 (D. Nev. Oct. 25, 2017), but *Williams* actually supports Plaintiff's position. The *Williams* Court held "the call cannot be an advertising call if it does not promote a commercially available product, good, or service" and found that because Medicaid is "a non-market based" program the calls were outside the scope of the TCPA. 2017 WL 4819097 at *7. But that is not this case. Weatherization products such as air conditioning and insulation, which QCS's text messages advertised, are not "non-market based"—they are widely available on the commercial marketplace. *Williams* is therefore inapposite.

Simply put, the text messages in this case were not "surveys, market research, political, or religious speech calls," which are the categories the FCC has mentioned as being excluded from the DNC rules. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039–40 (2003). QCS's text messages are commercial in nature, were sent by QCS to further an economic motive, and Defendant's Motion should be denied.

### C.      QCS's EBR Defense Fails

Finally, QCS argues that it can invoke the established business relationship ("EBR") exemption to the Do Not Call rules. (Dkt. 58 at 12-13.) Because it has no EBR with Plaintiff, this argument fails.

An established business relationship means "a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call . . .". 47 C.F.R. 64.1200(f)(5). It is Defendant's burden to prove that an EBR exists. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 Junk Fax Prevention Act of 2005*, 21 F.C.C. Rcd. 3787, 3793 (2006).

Here, there is no prior relationship between Plaintiff and Defendant and Plaintiff did not make a "purchase or transaction with [Defendant] within" the previously 18 months before the text messages were sent. The only basis for Defendant's argument to the contrary appears to be that Plaintiff and his fiancée previously subscribed to SWG. This does not constitute a "voluntary two-way communication" between Trujillo and QCS. Trujillo and his fiancée did have a SWG subscription that ended over 17 months before QCS's text messages were sent, but QCS is not SWG. Rather, QCS has a subcontractor relationship with RHA,

which has a contractual relationship with SWG. This is insufficient to constitute an established business relationship between Trujillo and QCS.

Moreover, while QCS states in conclusory fashion it sent the messages "on behalf of SWG", it provides no substantive argument that it was acting as SWG's agent when it sent the messages at issue. Thus, though a company may be able to establish an agency relationship with another company based on actual or apparent authority and/or ratification, QCS makes no such argument. *See Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1073 (9th Cir. 2019).

Additionally, the regulations state that the "subscriber's established business relationship with a particular business entity does not extend to affiliated entities unless the subscriber would reasonably expect them to be included given the nature and type of goods or services offered by the affiliate and the identity of the affiliate." 47 C.F.R. § 64.1200. This is echoed by the legislative history, which stated "the Committee believes the test to be applied must be grounded in the consumer's expectation of receiving the call." H.R. REP. 102-317, 15.

Here, while QCS argues that that the affiliate exception should extend to it (dkt. 58 at 13), no reasonable consumer would expect that a business's contractor's subcontractor has an "established business relationship" with the consumer over 17 months after the consumer canceled service with the business.  But more importantly QCS is plainly not SWG's affiliate. As the Ninth Circuit explained (in a TCPA case no less):

> The term "affiliate" carries its own, independent legal significance. "Affiliate refers to a 'corporation that is related to another corporation by shareholdings or other means of control....' " *Delaware Ins. Guar. Ass'n v. Christiana Care Health Servs., Inc.,* 892 A.2d 1073, 1077 (Del.2006) (quoting Black's Law Dictionary 59 (7th ed.1999)). The

plain and ordinary meaning of "affiliate" supports this definition as "a company effectively controlled by another or associated with others under common ownership or control." Webster's Third New International Dictionary 35 (2002). The record confirms that Nextones neither owns nor controls Simon & Schuster, nor can Nextones be considered a Simon & Schuster subsidiary. In fact, the record shows no direct contractual relationship between Nextones and Simon & Schuster.

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009).

QCS has no prior relationship with Plaintiff and it is not SWG's affiliate. Its EBR defense fails.

## IV.    CONCLUSION

For the reasons explained above, QCS's Motion for Summary Judgment should be denied in its entirety.


                                        Respectfully Submitted,
                                        **MICHAEL TRUJILLO**, individually and
                                        on behalf of all others similarly situated,

Dated: November 16, 2020                By:  ___/s/ Patrick H. Peluso___
                                               One of Plaintiff's Attorneys

                                        Afshin Siman (Cal. Bar No. 309956)
                                        Law Office of Afshin Siman
                                        6210 Wilshire Blvd., Suite 211
                                        Los Angeles, CA 90048
                                        Telephone: (424) 229-9778
                                        siman@simanlawfirm.com

                                        Steven L. Woodrow*
                                        swoodrow@woodrowpeluso.com
                                        Patrick H. Peluso*
                                        ppeluso@woodrowpeluso.com
                                        Woodrow & Peluso, LLC
                                        3900 East Mexico Avenue, Suite 300
                                        Denver, Colorado 80210
                                        Telephone: (720) 213-0676
                                        Facsimile: (303) 927-0809
                                        *Pro Hac Vice

1

## CERTIFICATE OF SERVICE

2

The undersigned hereby certifies that a true and correct copy of the above

3

titled document was served upon counsel of record by filing such papers via the

4

Court's ECF system on November 16, 2020.

5

/s/ Patrick H. Peluso

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28